IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| RAYNETTE AH CHONG, PATRICIA )<br>SHEEHEY, PATRICK SHEEHEY, )<br>individually and or behalf of )<br>the class of licensed foster )<br>care providers in the State )<br>of Hawaii, )<br>)<br>　　　　Plaintiff, )<br>)<br>　　vs. )<br>)<br>PATRICIA MCMANAMAN, in her )<br>official capacity as the )<br>Director of the Hawaii )<br>Department of Human Services, )<br>)<br>　　　　Defendant. )<br>_____ ) | CIVIL NO. 13-00663 LEK-KSC |

ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND
GRANTING IN PART AND DENYING IN PART
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

On August 7, 2015, Defendant Rachel Wong, DrPH, in her

official capacity as the Director of the Hawai`i Department of

Human Services ("DHS" and "Defendant"),[1] filed her Motion for

Summary Judgment ("Defendant's Motion"),[2] and Plaintiffs

Raynette Ah Chong ("Ah Chong"), Patricia Sheehey, and

Patrick Sheehey ("the Sheeheys," all collectively, "Plaintiffs"),

---

[1] When Plaintiffs filed the First Amended Complaint for
Declaratory Judgment and Permanent Injunctive Relief ("First
Amended Complaint"), Patricia McManaman was the Director of DHS.
[First Amended Complaint, filed 4/30/14 (dkt. no. 47), at ¶ 13.]

[2] Defendant filed an Errata to her motion on August 10,
2015.  [Dkt. no. 148.]

filed their Motion for Summary Judgment ("Plaintiffs' Motion").
[Dkt. nos. 143, 145.]  On October 26, 2015, Defendant filed her
memorandum in opposition to Plaintiffs' Motion ("Defendant's
Opposition"), and Plaintiffs filed their memorandum in opposition
to Defendants' Motion ("Plaintiffs' Opposition").  [Dkt. nos.
173, 174.]  On November 2, 2015, Defendant filed her reply
("Defendant's Reply"), and Plaintiffs filed their reply
("Plaintiffs' Reply").  [Dkt. nos. 180, 181.]

These matters came on for hearing on November 30, 2015.
After careful consideration of the motions, supporting and
opposing memoranda, and the arguments of counsel, Plaintiffs'
Motion and Defendant's Motion are both GRANTED IN PART AND DENIED
IN PART for the reasons set forth below.

## BACKGROUND

Plaintiffs bring this case pursuant to 42 U.S.C.
§ 1983, seeking declaratory judgments and injunctive relief on
the grounds that DHS's foster care maintenance payments and
adoption assistance payments are inadequate,[3] which they allege
violates the Child Welfare Act, Title IV-E of the Social Security
Act, §§ 670-679c ("CWA" or "Title IV-E").  [First Amended
Complaint at ¶¶ 1-3.]  The First Amended Complaint prays for this

---

[3] Plaintiffs' First Amended Complaint also includes
allegations regarding the adequacy of DHS's permanency assistance
payments, see, e.g., First Amended Complaint at ¶ 3, but those
portions of Plaintiffs' claims are not at issue in the instant
motions.

Court to: 1) assume jurisdiction over this action; 2) issue a declaratory judgment that Defendant is violating the CWA; 3) enjoin Defendant temporarily and permanently from failing to pay foster care maintenance payments that satisfy the requirements of the CWA; 4) order Defendant to prepare and implement a foster care maintenance payment system that complies with the CWA; 5) order Defendant to base adoption assistance payments on the foster care maintenance payment prepared and implemented in accordance with the payment system requested in this case; 6) award Plaintiffs the full costs of this action and reasonable attorneys' fees; and 7) order such other relief the Court may deem just and proper.  [Id. at pgs. 20-21.]

On August 17, 2015, this Court issued the Order Granting in Part and Denying in Part Plaintiffs' Motion for Class Certification ("8/17/15 Certification Order").  [Dkt. no. 156.] This Court certified a class of "all currently licensed foster care providers in Hawai`i who are entitled to receive foster care maintenance payments pursuant to the Child Welfare Act when they have foster children placed in their homes" ("the Class") and appointed Ah Chong as the representative of the Class.  [Id. at 33-34.]  All claims not prosecuted by the Class are being prosecuted on behalf of the named Plaintiffs only.  [Id. at 34.]

I.   **Overview of the CWA**

          The purpose of the CWA is to "enabl[e] each State to

provide, in appropriate cases, foster care . . . and adoption

assistance for children with special needs."  42 U.S.C. § 670.

The federal funds appropriated under the CWA are "used for making

payments to States which have submitted, and had approved by the

Secretary [of Health and Human Services], State plans under this

part," *i.e.* Title IV-E plans.  Id.  Title IV-E plans must, *inter*

*alia*:

>          (1)  provide[] for foster care maintenance
> payments in accordance with section 672 of this
> title and for adoption assistance in accordance
> with section 673 of this title;[4 and]
>
>          . . . .
>
>          (11) provide[] for periodic review of the
> standards referred to in the preceding paragraph
> and amounts paid as foster care maintenance
> payments and adoption assistance to assure their
> continuing appropriateness[.]

42 U.S.C. § 671.  The CWA contains the following relevant

definitions:

>          (3)  The term "adoption assistance agreement"
> means a written agreement, binding on the parties
> to the agreement, between the State agency, other
> relevant agencies, and the prospective adoptive
> parents of a minor child which at a minimum
> (A) specifies the nature and amount of any
> payments, services, and assistance to be provided

---

          [4] 42 U.S.C. § 672 sets forth the requirements for foster
care maintenance payments programs, and 42 U.S.C. § 673 sets
forth the requirements for adoption and guardianship assistance
programs.

under such agreement, and (B) stipulates that the agreement shall remain in effect regardless of the State of which the adoptive parents are residents at any given time.  The agreement shall contain provisions for the protection (under an interstate compact approved by the Secretary or otherwise) of the interests of the child in cases where the adoptive parents and child move to another State while the agreement is effective.

(4)(A)   The term "foster care maintenance payments" means payments to cover the cost of (and the cost of providing) food, clothing, shelter, daily supervision, school supplies, a child's personal incidentals, liability insurance with respect to a child, reasonable travel to the child's home for visitation, and reasonable travel for the child to remain in the school in which the child is enrolled at the time of placement. . . .

42 U.S.C. § 675.[5]

Although the CWA expressly defines what expenses must be covered by the foster care maintenance payment, it does not define what the adoption assistance payment covers.  However, it states that the adoption assistance payment

shall be determined through agreement between the adoptive parents and the State or local agency administering the program under this section, which **shall take into consideration the circumstances of the adopting parents and the needs of the child being adopted**, and may be readjusted periodically, with the concurrence of the adopting parents (which may be specified in the adoption assistance agreement), depending upon changes in such circumstances.  However, **in no case may the amount of the adoption assistance payment . . . exceed the foster care maintenance**

---

[5] Section 675(4)(A) also addresses the scope of foster care maintenance payment where the foster child is in "institutional care," but the instant case does not address foster children in institutional care.

> **payment which would have been paid** during the
> period if the child with respect to whom the
> adoption assistance payment is made had been in a
> foster family home.

42 U.S.C. § 673(a)(3) (emphases added).

## II.  Foster Care Maintenance Payments and Adoption Assistance Payments in Hawai`i

In Hawai`i, the foster care maintenance payment program
and the adoption assistance payment program are administered by
DHS's Child Welfare Services Programs.  See Haw. Admin. R. Title
17, Subtitle 11, Chapters 1617, 1620.  Haw. Admin. R. § 17-1617-2
states, in pertinent part:

> "Foster care maintenance payments" means payments
> issued by the department to compensate eligible
> caregivers for the provision of care and
> supervision to eligible foster children.  Foster
> care maintenance payments consist of a basic board
> rate, and if appropriate, difficulty of care
> payments based on an assessment of the child's
> need for higher level of care and supervision.
>
> "Foster care related payments" means payments for
> specified related costs not covered in the foster
> care maintenance payments for an eligible child,
> including but not limited to clothing,
> transportation, limited medical expenses, and
> activity fees.

The "basic board rate" covers "the amount of care and supervision
provided for a child whose medical needs, emotional and
psychological development, and behavior are within expected
norms."  Haw. Admin. R. § 17-1617-3(e)(1).  The "difficulty of
care" ("DOC") payment is paid

> in addition to the basic board rate, for a child
> who requires more care and supervision as

6

> documented by a treating professional because of
> the child's physical, emotional, psychological,
> and/or behavioral needs, or as documented by
> appropriate school personnel when the child
> requires academic or educational assistance that
> is over and above the average assistance needed
> for a child.

§ 17-1617-3(e)(2). There is no regulation defining the "basic board rate," but Plaintiffs have presented evidence that the current rates were calculated based on the cost of food, housing, and miscellaneous expenses. [Pltfs.' Concise Statement of Material Facts ("Pltfs.' CSOF"), filed 8/7/15 (dkt. no. 146), Decl. of Claire Wong Black ("Black Decl."), Exh. 7 (excerpts of 6/19/15 Depo. of Lisa Nakao ("Nakao Depo.")) at 33-36.[6]]

As of July 1, 2014, the monthly basic board rates are: $576 for children up to age five; $650 for children ages six to eleven; and $676 for children ages twelve and up. Where applicable, the monthly DOC payment can be up to $570. [Separate & Concise Statement of Facts in Supp. of Def.'s Motion ("Def.'s CSOF), filed 8/7/15 (dkt. no. 144), at ¶ 10; Pltfs.' Concise Counterstatement of Facts ("Pltfs.' Responsive CSOF"), filed 10/26/15 (dkt. no. 175), at 2 (admitting, *inter alia*, paragraph 10 of Def.'s CSOF).[7]] However, prior to July 1, 2014,

---

[6] Defendant designated Lisa Nakao as her Fed. R. Civ. P. 30(b)(6) designee for certain topics. [Black Decl. at ¶ 8.]

[7] Plaintiffs' Responsive CSOF does not have page numbers. The citations to its page numbers refer to the page numbers assigned in the district court's electronic case filing system.

the basic board rate was $529, and the rate had been the same since the legislature established it in 1990.[8]  See, e.g., Black Decl., Exh. 18 (Foster Care Maintenance Payment Analysis for Hawai`i, dated December 2013, by Susan Meyers Chandler, Ph.D. ("Chandler Report")) at 2.  Haw. Admin. R. § 17-1617-22, which was adopted on December 9, 2010, states that DHS "shall review at five-year periods the established rate of foster care maintenance payments to assure its continued appropriateness."

     The parties agree that, "[a]s a matter of policy[,] DHS pays the maximum adoption payment to adoptive parents."  [Def.'s CSOF at ¶ 25; Pltfs.' Responsive CSOF at ¶ 25 (admitting this portion of paragraph 25 of Def.'s CSOF).]  In other words, all adoption assistance payments are equal to the amount of the basic board rate that DHS would have paid for the child if he or she was still in foster care.  See, e.g., Motion for Class Certification, filed 4/23/15 (dkt. no. 120), Decl. of Raynette Nalani Ah Chong ("Ah Chong Decl.") at ¶ 5 ("I received $676 per month in adoption assistance payments for the older of my adopted children until he turned 21.  I currently receive $676 per month in adoption assistance payments for the younger of my adopted children.").  The purpose of this policy is "to avoid

---

[8] This Court notes that Ah Chong filed the original complaint in this case on December 3, 2013, citing the $529 rate. See, e.g., dkt. no. 1 at ¶ 28.

disincentivizing the adoption of children with special needs."

[Def.'s CSOF, Decl. of Kayle Perez ("Perez Decl.") at ¶ 5.[9]]

### III. __The Instant Motions__

Although the First Amended Complaint states a single § 1983 claim for violation of the CWA, there are three distinct theories of liability that are relevant the motions currently before this Court: 1) DHS's foster care maintenance payments are inadequate; 2) DHS does not conduct the required periodic review of the foster care maintenance payment rates to determine whether they are still appropriate; and 3) because the adoption assistance payments are limited to the amount of the inadequate basic board rate, DHS does not conduct individualized assessments to determine the appropriate amount of an adoptive child's assistance payment.

Defendant's Motion seeks summary judgment as to all portions of Plaintiffs' claim based on the following grounds: 1) there is no private right of action under § 1983 to challenge either the adequacy of a state's foster care maintenance payments or the failure to conduct periodic review; 2) there is no federally enforceable right associated with the receipt of adoption assistance payments; 3) the Sheeheys' claim alleging inadequate foster care maintenance payments is moot; and

---

[9] Kayle Perez is the Branch Administrator of the DHS, Child Welfare Services Branch.  [Perez Decl. at ¶ 1.]

4) Defendant is entitled to summary judgment because the Hawai`i foster care maintenance payments substantially comply with the CWA.  Plaintiffs' Motion seeks summary judgment as to the inadequacy of the foster care maintenance payments and the failure to conduct periodic reviews.  At the hearing on the motions, both sides acknowledged that there are issues of fact for trial.  However, they argue that the motions present issues of law that this Court can rule upon, and those rulings will clarify and focus the scope of the trial.

**DISCUSSION**

I.   **Preliminary Issues**

    A.   **Private Right of Action**

Defendant argues that "there is no private right of action under § 1983 to assert a claim for violation of 42 U.S.C. §§ 672 and 675(4)(A)."  [Mem. in Supp. of Def.'s Motion at 14.] This Court has previously ruled that Plaintiffs' claim challenging whether DHS's foster care maintenance payments comply with § 675(4)(A) is a cognizable § 1983 claim.  [EO: Order Denying Def.'s Motion for Partial Judgment on the Pleadings, filed 11/7/14 (dkt. no. 104), at 2 (citing Cal. State Foster Parent Ass'n v. Wagner, 624 F.3d 974, 982 (9th Cir. 2010) (holding that foster parents may bring a § 1983 claim to enforce the right "to foster care maintenance payments from the State that cover the cost of the expenses enumerated in

10

§ 675(4)(A)")).]  Defendant acknowledges that this Court is bound
by Ninth Circuit precedent, but reserves the right to argue on
appeal that Wagner was wrongly decided.  [Mem. in Supp. of Def.'s
Motion at 13-14 & n.1.]

Defendant also argues that there is no private right of
action to challenge a state's failure to conduct periodic reviews
of its foster care maintenance payments pursuant to § 671(a)(11).
[Id. at 18.]  This Court concludes that, insofar as the Ninth
Circuit recognizes that foster parents – called resource
caregivers in Hawai`i – have the right to challenge the adequacy
of the foster care maintenance payments, they also have the right
to challenge a state's failure to conduct periodic reviews of the
payments to ensure that the payments are adequate.  One without
the other would render the right to challenge adequacy of
payments meaningless.  The private right to enforce § 671(a)(11)
is a logical extension of the private right to enforce
§ 675(4)(A).

As to Plaintiffs' adoption assistance payment claim,
the Ninth Circuit has held that a plaintiff can bring a § 1983
claim to challenge the failure to make individualized adoption
assistance payment determinations under § 673(a)(3).  ASW v.
Oregon, 424 F.3d 970, 975-78 (9th Cir. 2005).  In the instant
Motion, Defendant reserves the right to argue on appeal that ASW
was wrongly decided.  [Mem. in Supp. of Def.'s Motion at 31 n.8.]

This Court is bound by the controlling Ninth Circuit precedent.  Defendant's Motion is therefore DENIED as to the argument that the applicable statutes do not support a private right of action.

**B.    The Sheeheys' Foster Care Maintenance Payment Claim**

It is undisputed that, when Plaintiffs filed the First Amended Complaint on April 30, 2014, the Sheeheys had a foster child in their home, and they had a Certificate of Approval from DHS to care for that child, and only that child.  They adopted the child on December 2, 2014, and DHS closed their resource family home.  The Sheeheys have not applied for a general resource caregiver license, which would allow them to care for other foster children in their home.  [Def.'s CSOF at ¶¶ 2-7; Pltfs.' Responsive CSOF at 2 (admitting, *inter alia*, paragraphs 2-7 of Def.'s CSOF).]  Defendant argues that, because the Sheeheys have neither a foster child in their home nor a general license to accept foster children at this time, their foster care maintenance payment claim is moot.

The United States Supreme Court has stated that a case becomes moot

> when the issues presented are no longer "live" or the parties lack a legally cognizable interest in the outcome.  But a case "becomes moot only when it is impossible for a court to grant any effectual relief whatever to the prevailing party."  Knox v. Service Employees, 567 U.S. –, –, 132 S. Ct. 2277, 2287, 183 L. Ed. 2d 281 (2012) (internal quotation marks omitted); see also

12

> Church of Scientology of Cal. v. United States,
> 506 U.S. 9, 12, 113 S. Ct. 447, 121 L. Ed. 2d 313
> (1992) ("if an event occurs while a case is
> pending on appeal that makes it impossible for the
> court to grant 'any effectual relief whatever' to
> a prevailing party, the appeal must be dismissed"
> (quoting Mills v. Green, 159 U.S. 651, 653, 16 S.
> Ct. 132, 40 L. Ed. 293 (1895))). As long as the
> parties have a concrete interest, however small,
> in the outcome of the litigation, the case is not
> moot.

Chafin v. Chafin, 133 S. Ct. 1017, 1023 (2013) (some citations
and internal quotation marks omitted). When a claim involves a
request for injunctive relief, and the court cannot grant relief
sought, the claim is moot. See, e.g., Ctr. for Biological
Diversity v. Lohn, 511 F.3d 960, 963-64 (9th Cir. 2007) (citing
Friends of the Earth, Inc. v. Bergland, 576 F.2d 1377, 1379 (9th
Cir. 1978) ("Where the activities sought to be enjoined have
already occurred, and the appellate courts cannot undo what has
already been done, the action is moot.")). However, even if the
request for injunctive relief is moot, if the claim also seeks
declaratory relief, "the case is not moot if declaratory relief
would nevertheless provide meaningful relief." Id. at 964.

Plaintiffs have presented a declaration by Mrs. Sheehey
stating that: "Although we are not currently caring for a foster
child, under certain circumstances we would continue to accept
foster children if asked by [DHS]. In particular, my husband and
I will only accept foster children with severe disabilities such
as cerebral palsy or an intellectual/developmental disability."

13

[Motion for Class Certification, Decl. of Patricia Sheehey ("Patricia Sheehey Decl.") at ¶ 8.]  Defendant has not presented any evidence to contest this, such as other statements showing contrary intent or evidence that it would not be possible for the Sheeheys to obtain a general resource caregiver license.  This Court also notes that the Sheeheys have served as resource caregivers for over fourteen years.  [Id. at ¶ 2.]  Because there is uncontested evidence that the Sheeheys may become resource caregivers again in the future, the declaratory relief they seek – a declaration that DHS's foster care maintenance payment system violates the CWA – is still meaningful.

In addition, even if both the Sheeheys' request for injunctive relief and their request for declaratory relief would otherwise be moot, Plaintiffs argue that "the capable of repetition while evading review" doctrine applies.  This Court agrees.  A court will not conclude that a case is moot if "it falls within a special category of disputes that are capable of repetition while evading review."  Turner v. Rogers, 131 S. Ct. 2507, 2514-15 (2011) (citation and internal quotation marks omitted).

> A dispute falls into that category, and a case
> based on that dispute remains live, if "(1) the
> challenged action [is] in its duration too short
> to be fully litigated prior to its cessation or
> expiration, and (2) there [is] a reasonable
> expectation that the same complaining party [will]
> be subjected to the same action again."  Weinstein

14

> _v. Bradford_, 423 U.S. 147, 149, 96 S. Ct. 347, 46
> L. Ed. 2d 350 (1975) (per curiam).

_Id._ at 2515 (alterations in _Turner_).

Defendant has presented evidence that over half of Hawai`i foster children are in foster care for less than thirty days.  [Def.'s Concise Statement of Facts in Opp. to Pltfs.' Motion ("Def.'s Responsive CSOF"), filed 10/26/15 (dkt. no. 172), Decl. of Dana A. Barbata ("Barbata Decl."), Exh. D (excerpts of 6/19/15 Depo. of Kayle Perez (Vol. I) ("Perez Depo.")) at 65 ("there's 54 percent of our kids return home within 30 days").]  Based on this time frame, the likely duration of the Sheeheys' future provision of foster care is "too short to be fully litigated."  _See Turner_, 131 S. Ct. at 2515 (holding that "imprisonment for up to 12 months, is 'in its duration too short to be fully litigated'").  This Court also finds that, based on the evidence that the Sheeheys have presented, including their long history as resource caregivers, there is a reasonable expectation that they will serve as resource caregivers in the future and will be subjected to the allegedly inadequate foster care maintenance payments again.

Either because this Court can still award meaningful declaratory relief to the Sheeheys or because their claims are capable of repetition while evading review, this Court CONCLUDES that their foster care maintenance payment claim is not moot.  Defendant's Motion is DENIED as to Defendant's mootness argument.

15

The Court now turns to the parties' requests for summary judgment on the merits.

## II.  <u>Foster Care Maintenance Payment Claim</u>[10]

As to both aspects of the foster care maintenance payment claim – the alleged inadequacy of the amount and the failure to conduct periodic review – this Court FINDS that there are genuine issues of material fact that preclude summary judgment.  <u>See</u> Fed. R. Civ. P. 56(a) ("The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.").  In particular, the issue of whether the current foster care maintenance payments are adequate requires this Court to weigh the competing expert testimony, including making credibility determinations regarding the experts.  Similarly, the issue of whether DHS currently has an adequate system to periodically review the foster care maintenance payments also involves weighing expert testimony and requires making credibility determinations regarding the DHS personnel who have given testimony about the process.  "The Court does not make credibility determinations or weigh conflicting evidence at the summary judgment stage."  <u>Kauhako v. Hawaii Bd. of Educ.</u>, CIVIL NO. 13-00567 DKW-BMK, 2015 WL 5312359, at *7 (D.

_____

[10] The Court notes that Ah Chong is pursuing this claim on behalf of the Class, and the Sheeheys are pursuing this claim on their own behalf because they are not members of the Class.

Hawai`i Sept. 9, 2015) (citing <u>Nelson v. City of Davis</u>, 571 F.3d 924 (9th Cir. 2009) ("[C]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.")). Thus, to the extent that Defendant's Motion and Plaintiffs' Motion both seek a final ruling on the merits of Plaintiffs' foster care maintenance payment claim, both motions are DENIED.[11]

At the hearing on the motions, the parties acknowledged that there are issues of fact that must be resolved at trial, but they urged this Court to rule upon certain discrete legal issues that will clarify the scope of the trial. This Court notes that the motions do not clearly seek rulings on these specific issues. Defendant's Motion seeks summary judgment on all of Plaintiffs' claims, [Def.'s Motion at 2,] and Plaintiffs' Motion appears to request summary judgment on the foster care maintenance payment claim [Pltfs.' Motion at 2-3]. Neither motion argues that, if this Court concludes that summary judgment is not warranted, it should rule on the discrete issues identified at the hearing. The parties appear to have changed their strategy after filing the motions, and this Court is not required to make rulings that were not requested in the motions. However, this Court agrees

---

[11] Because this Court has not considered any of the evidence presented through the parties' expert witnesses, it does not have to reach Plaintiffs' argument that Defendant failed to present a sufficient basis to establish the admissibility of Jerald Udinsky, Ph.D.'s expert report.

with the parties that, looking forward to the trial, there are certain legal issues that it must rule upon to clarify the scope of the trial.

A.   **Multiple Payments vs. Single Payment**

First, this Court notes that, because the State has elected to receive Title IV-E funds, it "must pay for the cost of listed items" in § 675(4)(A).  See Cal. All. of Child & Family Servs. v. Allenby, 589 F.3d 1017, 1022 (9th Cir. 2009).  However, "the CWA does not set rates or tell states how they are supposed to cover costs.  It does not require states to apply an index such as the [California Necessities Index],[12] or to adopt any particular system for arriving at the amount to be reimbursed." Id.  In addition, this Court agrees with Defendant that the references to "foster care maintenance payment**s**," in the CWA indicates that Congress contemplated that states could provide for the cost of the items listed in § 675(4)(A) through multiple sources.  See, e.g., 42 U.S.C. § 672(a)(1) ("Each State with a plan approved under this part shall make foster care maintenance payments on behalf of each child who has been removed from the

---

[12] The California Necessities Index ("CNI") "is a weighted average of changes in various costs of living for low-income consumers, including food, clothing, fuel, utilities, rent and transportation.  Thus, these annual adjustments reflect any increase or decrease in the cost of living, as measured by one constant calculation of inflation—the CNI."  Allenby, 589 F.3d at 1019 (citing Cal. Welf. & Inst. Code § 11453(a)).

home of a relative specified in section 606(a) of this title (as in effect on July 16, 1996) into foster care . . . .").

Defendant argues that DHS covers the costs of the § 675(4)(A) items in a number of different ways, in addition to the basic board rate and the DOC payment, where applicable. These include additional payments – such as a clothing allowance, activity fees, child care subsidies, and travel reimbursement (all collectively "foster care related payments") – as well as services provided without charge for foster children – including meals at public elementary and secondary schools, attendance at the Department of Education's A+ Program (which provides after school care), and liability insurance (all collectively "foster care related benefits"). [Def.'s CSOF, Decl. of Donna H. Kalama ("Kalama Decl."), Exh. G (Def.'s First Suppl. Response to Pltf.'s First Set of Interogs. to Def. Patricia McManaman, dated 5/6/15 ("Def.'s 5/6/15 Response to Interrogs.")) at 5-19.]  However, not all foster children receive the foster care related payments and the foster care related benefits.  According to Defendant, of the 1,019 Title IV-E foster children in Hawai`i from July 1, 2013 to June 20, 2014:

- 76.35% received one or more additional payments of the following categories of payments: Difficulty of Care, Clothing, Activity Fees, Medical Supplies, Miles/Bus, Respite, Transportation, Other.

- The percentage by category of payment is as follows:

- o DOC: 31.70
- o Clothing: 70.95
- o Activity Fees: 3.14
- o Med. Supplies: 10.99
- o Miles/Bus: 26.30
- o Respite: 18.14
- o Transportation: 4.51
- o Other: 3.13

[Black Decl., Exh. 11 (Def.'s First Suppl. Response to Pltfs.'
Second Set of Interogs. to Def. Rachel Wong, dated 5/7/15
("Def.'s 5/7/15 Response to Interrogs.")) at 5, 8.]  Of the 907
Title IV-E foster children in Hawai`i from July 1, 2014 to
February 28, 2015: 72.88% received some type of additional
payment; 31.31% received DOC payments; 67.25% received clothing
payments; 2.09% received activity fees; 8.60% received medical
supply payments; 19.40% received mileage or bus payments; 18.30%
received respite payments; 3.20% received other transportation
payments; and 2.65% received other payments.  [Id. at 5, 8-9.]

     Based on the fact that the CWA does not require that a
state cover all of the § 675(4)(A) items through a single payment
and the fact that the CWA does not require that a state employ
any particular methodology to determine how the enumerated costs
will be covered, this Court CONCLUDES that DHS can rely
collectively on the basic board rate, the DOC payment (where
applicable), the foster care related payments, and the foster
care related benefits to meet its obligation to cover the costs
of the § 675(4)(A) items.  Thus, to the extent that Plaintiffs
argue that DHS's basic board rates are inadequate as a matter of

law because they do not cover all of the items enumerated in § 675(4)(A), Plaintiffs' Motion is DENIED, and Defendant's Motion is GRANTED.

### B.   Payments for Expenses Not Listed in § 675(4)(A)

Second, Defendants have pointed out that there are a number of other payments that are available to resource caregivers which are beyond the scope of § 675(4)(A).  These include, *inter alia*: medical expenses that the resource caregiver – as opposed to the foster child – incurs because of the medical condition of the foster child (such as medical supplies and immunizations for the resource family); [Def.'s 5/6/15 Response to Interrogs. at 12-13; Haw. Admin. R. § 17-1617-4(a)(9);] respite care for the resource caregiver; [Def.'s 5/6/15 Response to Interrogs. at 18-19; § 17-1617-4(b);] and health insurance for foster children through Medicaid [Def.'s 5/6/15 Response to Interrogs. at 13].  Section 675(4)(A) sets forth what costs a state must cover for foster children in order for the state to be eligible to receive Title IV-E funds.  In other words, it is the **minimum** that a state with a Title IV-E program must provide: it is the floor and not the ceiling.  Nothing prevents a state with a Title IV-E program from providing **more** payments, reimbursements or benefits to resource caregivers.

Nor does the provision of additional payments, reimbursements, and benefits excuse a state from meeting its

obligations under the CWA to pay for all of the costs enumerated
in § 675(4)(A).  Cf. Allenby, 589 F.3d at 1021 ("Various
dictionaries indicate that to 'cover' in the context of costs
means an amount sufficient to pay all the costs."); id. at 1022
(concluding that the conditions of participation in the CWA are
that "the State must pay for the cost of listed items").  Simply
put, these types of funds are in addition to the § 675(4)(A)
items and are not counted as part of the minimum that a state
with a Title IV-E program must provide.

This Court therefore CONCLUDES that Defendant cannot
include payments, reimbursements, and benefits for items that are
not among those enumerated in § 675(4)(A) within the foster care
related payments and foster care related benefits that are
components of DHS's foster care maintenance payment.  To the
extent that Defendant has asked this Court to consider payments,
reimbursements, and benefits for non-enumerated costs as part of
DHS's foster care maintenance payments, Defendant's Motion is
DENIED and Plaintiffs' Motion is GRANTED.

   **C.    Consideration of Average Amounts
          of Foster Care Related Payments**

Plaintiffs urge this Court to conclude, as a matter of
law, that the Hawai`i foster care maintenance payments are
inadequate because not all resource caregivers receive every
foster care related payment.  Plaintiffs argue that DHS is
improperly relying on the average amount of foster care related

22

payments and treating the averages as if they were paid to all resource caregivers.

Defendant's expert, Jerald Udinsky, Ph.D., has opined that: "The total monthly value of [direct payments, reimbursements, and benefits to foster care clients by the State of Hawai`i] is $942 for the 0-5 age group, $1,176 for the 6-11 age group, and $1,227 for the 12+ age group."[13] [Kalama Decl., Exh. H (Economic Analysis of Foster Care Payments, dated 8/7/15, by Jerald Udinsky, Ph.D., President of the Udinsky Group ("Udinsky Report")) at 4-5.] The Udinsky Report includes the following table that summarizes those payments:

### Summary of Monthly Payments, Reimbursements, and Benefits

| Payment Type | 0-5 | 6-11 | 12+ |
|---|---|---|---|
| Basic Board Rate | $576 | $650 | $676 |
| Difficulty of Care | $117 | $191 | $198 |
| Clothing | $26 | $31 | $41 |
| Medical Supplement | $0 | $1 | $1 |
| Miscellaneous | $12 | $9 | $12 |
| Transportation | $20 | $19 | $24 |
| Respite | $4 | $5 | $4 |
| Medicaid Capitation | $187 | $187 | $187 |
| School Lunches | $0 | $83 | $83 |
| **Total:** | **$942** | **$1,176** | **$1,227** |

[Id. at Table 3A (footnotes omitted).] This Court has concluded that it cannot consider payments, reimbursements, and benefits

---

[13] This Court emphasizes that it has only considered Dr. Udinsky's report as an illustration of Defendant's position that payments, reimbursements, and benefits beyond the foster care maintenance payments, i.e. the foster care related payments and foster care related benefits, can be averaged among all resource caregivers.

for expenses that are not enumerated in § 675(4)(A) in evaluating

the adequacy of DHS's foster care maintenance payments.   This

Court therefore will not consider the payments, reimbursements,

and benefits for medical supplements, respite care, or Medicaid

capitable.[14]

---

[14] The Court also notes that the Children's Bureau – an Office of the U.S. Department of Health and Human Services, Administration for Children & Families – publishes a Child Welfare Policy Manual.   Section 8.3B.1, titled "TITLE IV-E, Foster Care Maintenance Payments Program, Payments, Allowable costs," states, in pertinent part:

> Federal medical payments on behalf of title IV-E eligible children in foster care are provided under the State's title XIX, Medicaid program, in accordance with title XIX, Medicaid Program, and with section 472 (h) of the Act.   The definition of "foster care maintenance payments" in section 475 (4) does not include medical expenses as an allowable cost in title IV-E.
>
> A State may not include in the title IV-E foster care maintenance payment a specific allowance for medical care – nor may a State be reimbursed under title IV-E for direct expenditures of the types described in the questions.   The "personal incidentals" item in the foster care maintenance payment under title IV-E, as provided by section 475 (4), may be used to meet incidental needs – and foster parents are not generally required to provide an accounting of specific expenditures, as long as the basic needs of the child are met and the maintenance payment is used for those needs.

The Child Welfare Policy Manual is available at https://www.acf.hhs.gov/cwpm/programs/cb/laws_policies/laws/cwpm/policy.jsp?idFlag=8.

Of the remaining items in Table 3A, Difficulty of Care, Clothing, Miscellaneous,[15] and Transportation reflect "[h]istorical **average** payments . . . based on inflation-adjusted payments to non-[child caring institution] foster care providers in Hawaii from January 1, 2009 through June 30, 2015." [Id. at Table 3A n.3 (emphasis added).] Defendant points out that the form that the U.S. Department of Health & Human Services ("U.S. DHHS") provides for a state to use in preparing its Title IV-E plan is "a 'pre-print' form . . . that lists each requirement of the plan and provides a space for the state agency to fill in the relevant law, regulation, or policy indicating it is in compliance with a requirement." [Mem. in Supp. of Def.'s Motion at 11 (citing Perez Decl., Exh. B (Hawai`i Title IV State Plan, OMB Approval No. 0980-0141, Expiration Date 2/29/16)).] Defendant therefore argues that "the Title IV-E program, including the plan, is concerned with aggregate outcomes for foster children, not individual payments for foster parents."

---

[15] The Miscellaneous category apparently includes "Miscellaneous Costs and Activity Fees." [Kalama Decl., Exh. H (Udinsky Report) at Table 3A n.3.]  "Activity Fees" may fall within the CWA enumerated category of "daily supervision."  See Def.'s 5/6/15 Response to Interrogs. at 14-15.  However, it is unclear what the "Miscellaneous Costs" refers to, particularly in light of the fact that the basic board rate already includes miscellaneous expenses.  At trial, this Court will not consider the payments, reimbursements, and benefits in the "Miscellaneous Costs" category as used in the Udinsky Report unless Defendant can establish that all of the payments, reimbursements, and benefits in that category are for expenses enumerated in § 675(4)(A).

25

[Id.]  This Court agrees with Defendant insofar as this Court

concludes that Defendant is not required to prove, on an

individual basis, that every foster child's foster care

maintenance payment covers all of his or her § 675(4)(A)

expenses.  In Allenby, the Ninth Circuit stated:

> As a general rule, a state that accepts federal
> funds with conditions attached must strictly
> comply with those conditions — substantial
> compliance will not be good enough.  See Withrow
> v. Concannon, 942 F.2d 1385, 1386–87 (9th Cir.
> 1991) (requiring strict compliance with a
> requirement in federal regulations of a review
> hearing within a pre-specified number of days).
> The CWA plainly attaches the condition that
> participating states "shall" cover the listed
> costs.  This said, [U.S.] DHHS regulations
> indicate that the federal government is willing to
> accept "substantial compliance" at least in some
> circumstances.  See, e.g., 45 C.F.R. §§ 1355.39,
> 1356.71(c)(5).  And it makes sense that compliance
> cannot, as a practical matter, invariably be
> strict.  Thus, California's system necessarily
> averages costs across each of the fourteen
> categories by which it classifies group homes, and
> the CNI is just a proxy for actual increases (or
> decreases) in cost.  Likewise, that the State's
> definition of covered items for foster care
> maintenance payments does not precisely mirror the
> federal statute does not make it noncompliant.
> Compare 42 U.S.C. § 675(4)(A), with Cal. Welf. &
> Inst. Code § 11460(b).  The State's plan generally
> tracks the federal definition of daily living
> expenses, making the State substantially
> compliant. . . .

589 F.3d at 1022-23.  However, the State of California paid for

the CWA enumerated expenses "at a rate that [was] approximately

80 percent of actual 1986-1987 costs adjusted for inflation."

Id. at 1018.  The Ninth Circuit therefore stated: "The federal

objective is for those costs to be covered.  As 80 percent isn't even close, and the State makes no serious argument that it is, we hold that its foster care maintenance payments do not substantially comply with the CWA."  Id. at 1023.

        This Court concludes that, pursuant to Allenby, it can consider average payments for certain CWA enumerated expenses in evaluating the adequacy of DHS's foster care maintenance payments, if the payment qualifies as substantial compliance with the applicable CWA requirement to cover the cost of – and the cost of providing – that expense.  However, at the high end, around seventy percent of Title IV-E foster children in Hawai`i received the clothing allowance, and at the low and, two to three percent of foster children received activity fees or other payments.  [Def.'s 5/7/15 Response to Interrogs. at 8-9.] Averaging those payments among all Title IV-E foster children in Hawai`i cannot constitute substantial compliance with the CWA requirement that the State cover the cost of – and the cost of providing – those categories of expenses.  This Court therefore CONCLUDES that Defendant cannot rely on the average foster care related payments or benefits for the Difficulty of Care, Clothing, Miscellaneous, and Transportation expense categories to establish the total foster care maintenance payment rate for all

foster children.[16]  To the extent that Plaintiffs' Motion seeks a

ruling that Defendant cannot average the foster care related

payments – which only some resource caregivers receive – among

all resource caregivers, Plaintiffs' Motion is GRANTED, and

Defendant's Motion is DENIED.

However, this Court does not conclude that DHS is

required to pay a standard rate for these expenses to all

resource caregivers.  The Court recognizes that, while all

resource caregivers incur certain expenses – such as food –

whenever they take in a foster child, they may not incur other

CWA expenses, depending on their individual circumstances.  For

example, as previously noted, there is evidence that over half of

Hawai`i foster children are in foster care for less than thirty

days.  If a child comes into foster care with his or her own

clothes and remains with a resource caregiver for less than

thirty days, the resource caregiver may not need to utilize any

of the available clothing allowance.  In another example, a

foster child may be placed in a resource family home that is

---

[16] Dr. Udinsky's Table 3A does **not** state that the School
Lunch benefit for school-age children is based on an average.
See Kalama Decl., Exh. H (Udinsky Report) at Table 3A nn.3 & 6.
Further, the parties have not identified for this Court evidence
regarding the percentage of foster children who attend public
school and therefore receive the free school lunch benefit.  If
Defendant presents evidence at trial that the percentage of
foster children receiving the benefit constitutes substantial
compliance, this Court will consider the school lunch benefit as
part of the foster care maintenance payments for the group ages
six to eleven and the group age twelve and above.

within walking distance from his or her school.  That resource caregiver would not need to utilize the transportation reimbursement for school travel.  In light of such situations, it is necessary for DHS to implement reasonable application requirements to ensure that a foster child actually needs certain foster care related payments or benefits.  This Court also recognizes that, although DHS may make certain foster care related payments or benefits reasonably available to resource caregivers, some caregivers may – for personal reasons – chose not to apply for them.  If DHS has made fact-specific foster care related payments or benefits reasonably available and DHS has informed the resource caregivers about them, DHS should not be penalized if some resource caregivers choose not to apply for them.

To account for the CWA enumerated expenses that are dependent upon a foster child's circumstances, at trial, this Court will evaluate the adequacy of the foster care maintenance payments for subclasses who receive those benefits separately from the foster care maintenance payments for the subclass who does not receive them.  That process is described *infra* Section IV.

    D.  **Challenges to the Use of Certain Types of Data**

Plaintiffs also argue that DHS's basic board rates are *per se* inadequate because the data that DHS used to calculate the

29

current rates was outdated and failed to take into account the higher cost of living in Hawai`i.  As previously noted, the CWA does not require states to employ any particular methodology in calculating its foster care maintenance payments.  See Allenby, 589 F.3d at 1022.  Further, although Plaintiffs have attempted to frame these matters as questions of law, they also involve disputes of material fact that must be resolved at trial.

For example, Defendant has submitted evidence that the current basic board rates were determined using a report by the United States Department of Agriculture ("USDA") tiled "Expenditures on Children by Families, 2011" ("2011 USDA Report").[17]  DHS used ninety-five percent of the amounts for the categories in the 2011 USDA Report for the Urban West region that were not either provided for or reimbursed through separate

---

[17] The 2011 USDA Report is available at http://www.cnpp.usda.gov/ExpendituresonChildrenbyFamilies.  See also Black Decl., Exh. 14.  Defendant asks this Court to take judicial notice of the report.  [Mem. in Supp. of Def.'s Motion at 27 & n.5.]  The report "provide[s] estimates of annual expenditures on children from birth through age 17."  [2011 USDA Report at iii (Executive Summary).]
For purposes of the instant motions, this Court will take judicial notice of the existence of the 2011 USDA Report and the contents thereof, but this Court makes no findings regarding the accuracy of the report's contents.  See Fed. R. Evid. 201(b)(2) ("The court may judicially notice a fact that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.").

payments apart from the basic board rate.[18]   [Kalama Decl.,

Exh. D (Nakao Depo.) at 43-46, 51; id., Exh. E (excerpts of

6/19/15 Depo. of Kayle Perez (Vol. I) ("Perez Depo.")) at 48.]

As previously noted, the three categories of expenses that the

basic board rate is intended to cover are food, housing, and

miscellaneous expenses.   [Black Decl., Exh. 7 (Nakao Depo.) at

33-36.]   Defendant has argued that, even in light of the high

cost of living in Hawai`i, it was appropriate for DHS to use the

amounts from the Urban West region because that region contains

other cities with a high cost of living, such as Los Angeles,

San Francisco, San Diego, and Seattle.   [Def.'s Opp. at 13

(citing Barbata Decl., Exh. A (excerpts of 8/19/15 Depo. of

Patricia McManaman) at 141-42).]

          In contrast, Plaintiffs have submitted evidence which

they argue establishes that DHS used ninety-five percent of the

Urban West amounts from the 2011 Report, not because the adjusted

amounts were accurate reflections of the relevant CWA expenses in

Hawai`i, but because those amounts were reverse-engineered to

comport with DHS's budget request to the state legislature.   See,

e.g., Black Decl., Exh. 19 (email string between Barbara

Yamashita, Lisa Nakao, and others during January 2014) at SOH

----

[18] The "Urban West" states are: "Alaska, Arizona,
California, Colorado, Hawaii, Idaho, Montana, Nevada, New Mexico,
Oregon, Utah, Washington, and Wyoming."   [2011 USDA Report at
28.]

11558 ("We need to change the tables to 2011 and only up to the
$8.5 M request to the legislature in this budget.").

Ultimately, the question is whether the Hawai`i foster
care maintenance payments, which include the basic board rates,
are adequate to cover the cost of – and the cost of providing –
the expenses enumerated in § 675(4)(A). Determining whether the
current basic board rates are adequate to cover the cost of – and
the cost of providing – food, housing, and miscellaneous expenses
will require this Court to, *inter alia*, weigh competing evidence
and make credibility determinations. To the extent that
Plaintiffs ask this Court to rule, as a matter of law, that DHS's
basic board rates are inadequate because the data in the 2011
USDA Report was outdated and did not take into account the higher
cost of living in Hawai`i, this Court FINDS that there are
genuine issues of material fact for trial and DENIES Plaintiffs'
Motion as to these issues.

Plaintiffs also make a similar argument regarding the
DOC payments. They argue that DHS's current DOC cap – which, as
previously noted, is currently $570 a month – is *per se*
inadequate because it is based upon 1997 rates. As a threshold
matter, Defendant argues that a challenge to the adequacy of the
DOC payment is beyond the scope of this action because
Plaintiffs' First Amended Complaint does not include such a
claim. This Court disagrees. While the First Amended Complaint

32

does not contain an express allegation that the DOC payment system is inadequate, it clearly alleges that Hawai`i foster care maintenance payments are inadequate and violate the CWA.  <u>See, e.g.</u>, First Amended Complaint at ¶ 55.  Under Hawai`i law, by definition, the foster care maintenance payment includes the basic board rate and, if applicable, the DOC payment.  <u>See</u> Haw. Admin. R. § 17-1617-2.  Thus, this Court construes Plaintiffs' challenge to the Hawai`i foster care maintenance payment system as including a challenge to the DOC payment system.

Plaintiffs, however, have not carried their burden of proof for their request for summary judgment as to the inadequacy of the DOC payment system.  Although Plaintiffs' counsel represented at the hearing on the motions that the DOC cap is based upon 1997 wage rates, Plaintiffs did not set this forth in their concise statements of facts, nor did they identify any statements of undisputed material facts regarding the adequacy of the DOC payments.  <u>See generally</u> Pltfs.' CSOF; Pltfs.' Responsive CSOF.

As to the DOC payment system, this Court GRANTS Plaintiffs' Motion insofar as this Court rules that their claims in this case include a challenge to the DOC payment system, but this Court DENIES Plaintiffs' Motion as to the merits of that challenge.

33

E.     <u>**Challenges Regarding Specific CWA Expenses**</u>

1.     <u>**Shelter**</u>

Plaintiffs argue that DHS's basic board rates violate the CWA because, although the rates purportedly cover shelter, the allocation for shelter is limited to "utilities, use of household furnishing & equipment, [and] operations." [Black Decl., Exh. 18 (Chandler Report) at 8, § 1.]  It does not include mortgage payments, rent, or property taxes.  When DHS determined the current basic board rates based on the 2011 USDA Report's average costs in the Urban West, DHS deducted those types of expenses from the average shelter costs because DHS has determined that resource caregivers must be financially self-sufficient without the foster care maintenance payment.  In other words, they must be able to pay their rents or mortgages before becoming resource caregivers.  [Kalama Decl., Exh. D (Nakao Depo.) at 51-52.]  Haw. Admin. R. Title 17, Subtitle 11, Chapter 1625, which governs the licensing of resource family homes, states that: "Prior to the child's placement into the home, the income of the resource family home shall be sufficient to maintain an adequate standard of living for the family before the addition of a foster child."  Haw. Admin. R. § 17-1625-9(a).  Defendant has presented testimony that the reason for this requirement is "because it's not every day that a [foster] child is going to be in the home.  So we need to make sure that the

34

family can sustain itself without a [foster] child." [Kalama Decl., Exh. E (Perez Depo.) at 17.] Thus, the portion of the basic board rate attributable to shelter "is really a reimbursement to the **additional expenses** that the [foster] child brings to the home with their presence there." [<u>Id.</u> at 18 (emphasis added).] It does not reflect the foster child's pro rata share of all housing expenses.

The CWA does not define what is included in the "shelter" expense. Plaintiffs have not identified, and this Court is not aware of, any regulation or binding case law that requires it to interpret the "shelter" expense as including mortgage payments, rent, property taxes, and similar costs. The CWA defines a "foster family home" as "a foster family home for children which is **licensed by the State** in which it is situated or has been approved, by the agency of such State having responsibility for licensing homes of this type, as **meeting the standards established for such licensing**." 42 U.S.C. § 672(c) (emphases added). Thus, Congress has left the matter of licensing qualified foster family homes – in Hawai`i, resource family homes – to the states. The State of Hawai`i has determined that one of the necessary requirements is that a potential resource family be financially self-sufficient, including being able to pay its rent or mortgage and property taxes. This is reasonable in light of the fact that over half of

35

Hawai`i foster children are in foster care for less than thirty days.  In light of this fact, a resource caregiver who takes in a foster child would be unlikely to rent or purchase a larger home to accommodate the foster child.  Thus, the resource caregiver would not incur additional rent, mortgage, or property tax expenses as a result of the placement.[19]

Plaintiffs have not presented any authority that requires all states to pay rent, mortgage, property taxes, and other similar costs as part of the shelter expense category.  Defendant has presented evidence regarding the rationale behind DHS's requirement that resource families be financially self-sufficient to obtain a license, and this Court finds that the rationale is reasonable.  Thus, to the extent that Plaintiffs' Motion asks this Court to rule that DHS's basic board rates are inadequate, as a matter of law, because they do not cover the cost of rent, mortgage payments, property taxes, and other similar expenses, Plaintiffs' Motion is DENIED.

_____

[19] This Court acknowledges that the scope of the requirement to cover the cost of – and the cost of providing – shelter may be different in states where the trends in foster care are factually distinguishable from the trends in Hawai`i.  The issue before this Court is limited to what is required to cover the cost of – and the cost of providing – shelter for foster children in Hawai`i.

## 2.    School Supplies, Liability Insurance and Transportation

Finally, Plaintiffs argue that DHS's foster care maintenance payments are inadequate because they do not cover the cost of – and the cost of providing – school supplies, liability insurance, and transportation.  This Court FINDS that the factual record is not sufficiently developed to allow this Court to evaluate the adequacy of DHS's foster care related payments or benefits for these § 675(4)(A) expense categories.  Because there are genuine issues of material fact for trial as to the issue of whether DHS is covering the cost of – and the cost of providing – school supplies, liability insurance, and transportation, Plaintiffs' Motion is DENIED as to these issues.

## III. Adoption Assistance Payment Claim[20]

As previously noted, as a matter of policy, DHS pays the amount of the basic board rate for every child eligible for adoption assistance payments.  The Sheeheys receive $576 per month in adoption assistance, and Ah Chong receives $676, based on the ages of their respective adopted children.  [Patricia Sheehey Decl. at ¶ 7; Ah Chong Decl. at ¶ 5.]  Plaintiffs contend that the basic board rate is so low that they have been deprived

---

[20] The Court notes that Ah Chong and the Sheeheys are pursuing the adoption assistance payment claim on their own behalf.  This Court denied class certification of the proposed adoption assistance subclass and ruled that the members of the proposed adoption assistance subclass could not be included within the Class.  [8/17/15 Certification Order at 28-33.]

of individualized determinations of their adoption assistance
payment amounts, as required by § 673(a)(3).  This Court
CONCLUDES that, as a matter of law, DHS's adoption assistance
payment policy violates the CWA because DHS has improperly
limited the amount of the adoption assistance payment to the
amount of the **basic board rate**, not the amount of the **foster care
maintenance payment** as stated in the CWA.

Specifically, under Hawai`i law, the foster care
maintenance payment includes both the basic board rate and, where
applicable, the DOC payment.  See Haw. Admin. R. § 17-1617-2.  In
addition, in this case, Defendant has argued that: 1) DHS relies
upon the basic board rate, DOC payments, as well as any
applicable foster care related payments and foster care related
benefits to provide for the expenses that must be covered under
§ 675(4)(A); and 2) this methodology complies with the CWA.  The
evidence presented at trial will establish what other foster care
related payments or benefits – if any – qualify as part of the
foster care maintenance payment in Hawai`i.

Thus, this Court GRANTS Plaintiffs' Motion insofar as
this Court CONCLUDES that Ah Chong and the Sheeheys are entitled
to: a declaratory judgment that the manner in which DHS
determined their adoption assistance payment amounts violated the
CWA; and injunctive relief requiring DHS to reassess their
respective payment amounts.  This Court DENIES Plaintiffs' Motion

insofar as this Court FINDS that there are genuine issues of material fact regarding the precise scope of the injunctive relief, *i.e.* whether there are any foster care related payments or foster care related benefits that can be considered as part of the maximum amount of Ah Chong's and the Sheeheys' respective adoption assistance payments.

## IV.   <u>Issues for Trial</u>

In order to provide guidance to the parties in their preparation for trial, this Court hereby outlines the manner in which it will consider the general issues at trial.  The specific issues discussed *supra* all fall within one of these general issues.  As to the Class's foster care maintenance payment claim, this Court will consider the following issues:

1)   Is the basic board rate, which each Class member receives when he or she has a current foster child placement, adequate to cover the cost of – and the cost of providing – a foster child's food, shelter, and miscellaneous expenses?

2)   As to each of the other expense categories enumerated in § 675(4)(A), does DHS have a foster care related payment or foster care related benefit that is available to resource caregivers when it is necessary based on a foster child's individual circumstances?

   a)   For each foster care related payment or benefit described in Question 2, does DHS employ a reasonable methodology to ensure that a resource caregiver who applies for the foster care related payment or benefit receives what is necessary to cover the cost of – and the cost of providing – the CWA expense relevant to that payment or benefit?

   b)   For each foster care related payment or benefit described in Question 2, does DHS provide resource caregivers with sufficient information and

39

opportunities to apply for the foster care related
payment or benefit?

c)  For each foster care related payment or benefit
    described in Question 2, are the resource caregivers
    who apply for the foster care related payment or
    benefit receiving what is necessary to cover the cost
    of – and the cost of providing – the CWA expense
    relevant to that payment or benefit?

A foster care related payment or foster care related benefit that

satisfies Questions 2, 2a, 2b, and 2c will be considered as a

component of the foster care maintenance payment.  For each

foster care related payment or benefit that satisfies all four

questions, this Court will consider the resource caregivers

receiving the foster care related payment or benefit as a

separate subclass from the resource caregivers who do not.

Unless the evidence at trial establishes that another method is

more accurate, this Court will consider the average amount or

value of the foster care related payment or benefit that the

members of the subclass receive.  In addition, as to all members

of the Class, this Court will consider:

3)  Does DHS have a reasonable mechanism in place to conduct
    periodic reviews of all components of its foster care
    maintenance payments?

Although the Sheeheys are not members of the Class, these

questions also apply to their individual foster care maintenance

payment claim.

        As to Ah Chong's and the Sheeheys' adoption assistance

payment claims, based on the evidence presented at trial

regarding the foster care maintenance payment claims as well as
the evidence specific to their adoption assistance payment
claims, this Court will determine what the foster care
maintenance payment would have been for each of the children for
whom they receive adoption assistance payments.  Those amounts
are the correct maximum adoption assistance payments available to
them under § 673(a)(3), and this Court will order the appropriate
injunctive relief based on that maximum.

<u>**CONCLUSION**</u>

On the basis of the foregoing, Plaintiffs' Motion for
Summary Judgment and Defendant's Motion for Summary Judgment,
both filed on August 7, 2015, are HEREBY GRANTED IN PART AND
DENIED IN PART.

As to the Class's and the Sheeheys' foster care
maintenance payment claims:

-Defendant's Motion is GRANTED insofar as this Court CONCLUDES
     that DHS is not required to include all of the CWA
     enumerated expenses in the basic board rates;

-Plaintiffs' Motion is GRANTED insofar as this Court CONCLUDES
     that payments, reimbursements, and benefits for costs that
     are not enumerated in the CWA cannot be included as part of
     DHS's foster care maintenance payments;

-Plaintiffs' Motion is GRANTED insofar as this Court CONCLUDES
     that DHS cannot rely on, for all resource caregivers, an
     average of payments that only some resource caregivers
     receive;

-Plaintiffs' Motion is GRANTED insofar as this Court CONCLUDES
     that their claims in this case include a challenge to the
     difficulty of care payment system; and

41

–Defendant's Motion and Plaintiffs' Motion are DENIED in all other respects.

As to Ah Chong's and the Sheeheys' adoption assistance payment claims, Defendant's Motion is DENIED in all respects, and Plaintiffs' Motion is GRANTED insofar as this Court CONCLUDES that Ah Chong and the Sheeheys are entitled to: a declaratory judgment that the manner in which DHS determined their adoption assistance payments violated the CWA; and injunctive relief requiring DHS to reassess the amounts of their respective payments.  Plaintiffs' Motion is DENIED insofar as this Court cannot determine, based on the current record, the precise scope of the declaratory relief.

IT IS SO ORDERED.

DATED AT HONOLULU, HAWAII, December 30, 2015.



/s/ Leslie E. Kobayashi
Leslie E. Kobayashi
United States District Judge

**RAYNETTE AH CHONG, ET AL. VS. PATRICIA MCMANAMAN, ETC.; CIVIL 13-00663 LEK-KSC; ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**